Richard S. Busch (5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-541

Kenneth E. Gordon (5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone: (212) 355-3200
Facsimile: (212) 355-3292

Attorneys for Plaintiff

JUDGE ENGELMAYER

12 CV 7249

RECEIVED SEP 26 2012 U.S.D.C. S.D.N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLE MEDIA MANAGEMENT, L.P., | ) |
| | ) Case No. _____ |
| **Plaintiff,** | ) |
| v. | ) **COMPLAINT FOR BREACH OF CONTRACT** |
| EMI APRIL MUSIC, INC., and EMI BLACKWOOD MUSIC, INC. | ) **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) |

Plaintiff Ole Media Management, L.P. ("Ole"), by and through its attorneys, for its Complaint against the Defendants named above alleges, on knowledge as to its own behavior and on information and belief as to the behavior of others, as follows:

### Parties

1. Plaintiff Ole is a partnership between Ole Media Management (GP) L.P. and Ole Media Management (GP) Inc. all of which are Canadian entitites with their principal place of business in Toronto, Ontario.

2. Defendant EMI April Music, Inc. is a Connecticut corporation with its principal place of business in New York, New York.

3. Defendant EMI Blackwood Music, Inc. is a Connecticut corporation with its principal place of business in New York, New York. (Defendants collectively are referred to as ("EMI").

### Jurisdiction and Venue

4. The jurisdiction of this Court is based upon 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Personal jurisdiction over EMI is proper in this Court on the grounds that (a) EMI transacts business in the State of New York; (b) EMI's wrongful conduct, alleged herein, occurred in the State of New York and in this District; and, (c) the contracts that are the subject of this action were entered into in this District.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(c).

### Factual Allegations

6. Ole is one of the world's largest independent music publishers. Its catalog includes over 45,000 songs and 40,000 hours of television music across all genres. Ole is the publisher of numerous chart-topping hits including songs performed by Taylor Swift, Kelly Clarkson, Britney Spears, Pink, 'N Sync, the Backstreet Boys, Aerosmith, and Tim McGraw.

7. On or about January 1, 2007 and on or about March 21, 2007, Ole and EMI entered into two exclusive administration agreements (collectively, the "Administration Agreements").

9. On or about February 23, 2007 and on or about March 21, 2007, Ole and EMI Entertainment World, Inc. entered into two asset purchase agreements (collectively, the "Asset Purchase Agreements"). These Asset Purchase Agreements transferred to Ole numerous musical

2

compositions including the musical compositions featured in some of cinema's most successful and well-loved films such, *Ben Hur, Cleopatra, North by Northwest, Poltergeist, Clash of the Titans,* and *The Apartment.*

10. Under the terms of these Administration Agreements, EMI took on the duty to administer certain compositions (the "Compositions comprising "Ole's catalog").

11. EMI contracted to "perform all such services as are customarily and reasonably required of a music publisher to administer and exploit the Compositions." EMI's duties included the collection of "all royalties payable with respect to the Compositions" and providing regular and accurate accountings to Ole.

12. Under the terms of the Administration Agreements, EMI was to assume full responsibility for the collection of all monies payable to Ole for the compositions covered by the Administration Agreements. EMI had a duty to collect all money payable to Ole and to accurately account to and pay that money to Ole.

13. The Administration Agreements required EMI to account to Ole quarterly and pay Ole semi-annually. While EMI did account to Ole, after EMI began administering Ole's Compositions, the income from the Compositions declined dramatically.

14. The Administration Agreements allow for Ole to "appoint an accountant to examine" EMI's books and records "for the purpose of verifying the accuracy of the statements sent to [Ole]."

15. The decline in royalties received from the catalog forced Ole to engage an accounting firm (the "auditors") to examine EMI's books and records (the "Audit"). The Audit revealed vast and systematic underpayments to Ole.

16. On August, 27, 2010, the results of this Audit were provided to EMI setting forth specific objections to the manner and amount of payment made by EMI to Ole. EMI has failed to cure its breaches. Instead, EMI's erroneous accountings and payments have continued into the periods following the Audit. In July 2012, Ole again notified EMI of EMI's faults with its accounting and the need to conduct another examination of EMI's books and records. Again, EMI has failed to cure its deficient accountings and payments. Instead, EMI refused to allow Ole to conduct a second audit.

17. The Audit revealed that Ole is owed at least $129,811 for unreported domestic income. On a sample basis, the auditors compared source statements that EMI received from ASCAP and BMI, with the royalties reported to Ole. This review showed a number of inconsistencies. The sampling found that on $51,573.88 of royalties for five films, EMI owed an additional $8,284.89 to Ole. This is an underpayment of more than 16%. Based on accepted sampling techniques this demonstrates that in full EMI underpaid Ole by a minimum of $129,811. Upon information and belief, these same failures continue through the present.

18. The Audit also revealed that Ole had not received a proper accounting based on review of "ZAP" reports provided by ASCAP. ASCAP provided ZAP reports for three films. The auditors analysis of the ZAP reports disclosed that ASCAP's credits for satellite radio were not included in the computation of amounts distributed and all concert credits were assigned a point value of zero. These errors show that EMI is not accounting to or paying Ole public performances of the Compositions. Both these inconsistencies resulted in an understatement of earnings. This understatement of earnings resulted in underpayment to Ole of at least $18,512.05.

4

19. EMI also underpaid Ole based on its failure to collect and/or distribute all foreign income. On a sample basis the auditors reviewed source statements from affiliated foreign sub-publishers. In some cases, compositions reported to EMI were not reported to Ole. In these instances, EMI simply kept money that was due to Ole. Additionally, there were other unreported royalties which were not properly collected by EMI. In these instances, EMI failed to collect money that was due to Ole. This unreported foreign income has resulted in an underpayment to Ole in an amount in excess of $296,497.06. EMI has systematically engaged in this type of behavior. EMI's wrongful conduct continues into the royalty periods after the audit as Ole continues to be denied the benefit of its bargain.

20. Additionally, the Audit revealed that EMI was not paying Ole based on its full ownership of certain compositions. On many compositions which are owned wholly by Ole, EMI reported to Ole as if a portion of certain compositions were owned by some other entity. This erroneous payment of a portion of Ole's share to another party or EMI's failure to pay this share at all, resulted in an underpayment to Ole in an amount in excess of $129,406.90. EMI has failed to remedy this breach and continues to pay Ole only a portion of the royalties due for the exploitation of these compositions.

21. Paragraph 6.02 of the Administration Agreements provides that to the extent EMI is allowed a tax credit or deduction as a result of its payment of foreign taxes, that the tax reduction shall be credited to Ole. EMI has consistently failed to account to Ole for this windfall.

22. The auditors' examination revealed that some sub-publishers withheld foreign income taxes on monies remitted to EMI. EMI failed to provide information regarding its use of these foreign tax credits or deductions. However, the auditors determined that, upon information and belief, EMI benefited twice from such tax issues, by paying Ole as if the foreign taxes were an

expense Ole had to bear and then received the benefit of the tax credit or deduction created by the payment of those foreign taxes. The Audit revealed that this tax issue resulted in the underpayment of Ole in an amount in excess of $25,925.11. That amount does not include additional tax credits which have come due to EMI in the post-Audit periods and which have not been accounted to or paid to Ole.

23. The Audit also revealed that Ole has been underpaid for "Black Box" income. In various foreign territories including Belgium, France, Germany, the Netherlands, Italy, South Africa, Spain, and the United Kingdom, music publishers receive income from their respective collection societies which is commonly referred to as Black Box income. Black Box income is distributed to publishers based upon the ratio that each publisher's specifically allocated receipts bear to the total receipts by all publishers. If EMI had correctly segregated Ole's catalog at the affiliate level, then Black Box income attributable to Ole would have been reported to, and paid to Ole. EMI's failure to adequately act under the Administration Agreements caused Ole to be underpaid by more than $100,090.98 because Ole did not receive this Black Box income. EMI has still not properly segregated Ole's catalog. Thus, EMI is receiving Black Box income owed to Ole and is keeping that income for its own benefit.

24. In addition to the amounts discussed above, upon information and belief, Ole is owed a substantial amount for other breaches of the Administration Agreements. The scope of the Audit was severely limited by EMI's refusal to provide requested information, including foreign sub-publisher agreements, a cash receipts journal, a general ledger, books of original entry, access to EMI's suspense account, full and complete information regarding Black Box income and other unallocated income received by foreign sub-publishers, and the details of all digital music settlements and related allocations. EMI's refusal to provide these necessary books and records,

is itself a breach of the Administration Agreements. Access to these books and records would doubtlessly show additional amounts due to Ole. As such, Ole has been directly financially harmed by EMI's failure to allow for a full and complete Audit.

25. EMI also failed to provide other important information regarding its administration work. There are 161 MGM produced episodes of *Tom and Jerry* which contain music owned by Ole. During the course of the Audit, EMI only provided cue sheets for 142 episodes. Cue sheets are central to payments for uses of compositions. EMI requested that ASCAP provide *Tom and Jerry* cue sheets. However, ASCAP was only able to provide cue sheets for 73 episodes. This failure to account for numerous episodes of *Tom and Jerry* is a breach of the Administration Agreements and has resulted in underpayments to Ole. However, without discovery, Ole is unable to determine the exact amount of that underpayment.

26. Further, the auditors were not provided with the ZAP reports for *Tom and Jerry*. As discussed above, the ZAP reports for other media revealed vast underpayments to Ole. As the music contained in *Tom and Jerry* episodes is among the most profitable of the music at issue in this litigation, EMI's failure to correctly account to and pay Ole for that music has resulted in significant underpayments to Ole. This failure is compounded by the auditors inability to view and analyze the necessary ZAP reports.

27. The auditors also determined that foreign source statements for *Tom and Jerry* income were incomplete and some cues listed on the *Tom and Jerry* cue sheets were not reported to Ole. Additionally, the auditors determined that some foreign uses of *Tom and Jerry* are not being reported to EMI and thus, are not being accounted to or paid to Ole. These uses were not paid during the periods in the Audit and have not been paid in the time since the Audit was conducting. Each of these failures is a separate breach of the Administration Agreements.

28. During the Audit, Ole presented EMI with copies of artwork from DVDs containing episodes of *Tom and Jerry* in order to inquire as to the status of the music publishing revenues that should be associated with these DVDs. EMI responded that it was not aware of these DVDs or music licenses for these DVDs. This failure to collect is a breach of the Administration Agreement.

29. Administration of the *Tom and Jerry* compositions is central to the Administration Agreements. The music contained in these episodes is extremely valuable. EMI's failures, as discussed above, to properly administer these compositions is ongoing and is the cause of significant financial harm to Ole.

30. Further, EMI administers at least 82 compositions on behalf of Ole for which no income was reported. It is implausible that EMI did not receive any income on these 82 titles. EMI's failure to collect and pay income on these titles is a breach of the Administration Agreements and has resulted in direct financial harm to Ole.

31. The Audit also revealed that compositions in Ole's catalog had been licensed to several digital providers such as Napster, Fullaudio, and Listen.com, but no royalties for those licenses were reported to Ole. EMI's failure to collect income for licenses is a breach of the Administration Agreement and has resulted in financial harm to Ole in an amount that cannot yet be determined. This discovery shows that EMI is entering licenses on behalf of Ole and failing to account to Ole any money for those licenses. This is a dereliction of EMI's duties and is a continuing and on-going harm.

32. EMI has also failed to pay distributions to Ole for settlements reached with YouTube, Napster, Audiogalaxy, MobiTV, and others. These settlements were made to settle infringement claims regarding numerous compositions. Included in these compositions, are the compositions

8

which make up Ole's catalog. However, EMI has failed to pay any portion of the settlements it received to Ole even though a portion of the settlement amount is attributable to the Compositions.

32. EMI represented to Ole that the administered catalog would be segregated from EMI's general catalog in order to provide a more transparent and accurate accounting of royalties to Ole. EMI failed to segregate Ole's catalog. Instead, Ole's catalog was commingled with, and spread across, EMI's general catalog. This resulted in less transparent accounting and less accurate payments to Ole. EMI's failure also dramatically increased the costs associated with conducting the Audit. This is the direct cause of financial harm to Ole.

33. EMI has failed to account for and pay Ole more than $800,000 during the period audited. Upon information and belief, EMI's failures to properly account to and pay Ole continues in the royalty periods following the Audit which has and will continue to result in additional monetary damages not yet known to Ole. EMI's refusal to allow a second audit compounds this issue and further prevents Ole from receiving the benefit of its bargain.

34. Further, EMI's failure to timely pay Ole, as required by the Administration Agreements, has caused Ole to be deprived of the use of substantial funds causing additional financial harm.

### Claim I

### Breach of Contract

35. Ole realleges each and every allegation in paragraphs 1 through 34 as if fully set forth herein.

36. The Administration Agreements between Ole and EMI are valid and enforceable. Ole has fully performed its obligations under the Administration Agreements.

37. EMI has failed to comply with the terms of the Administration Agreements, and failed to fulfill its obligations under the Administration Agreements, by failing to properly account to and pay Ole. EMI's failures include, but are not limited to, EMI's failure to collect all revenue and royalties due Ole, properly account to Ole for money received which is directly attributable to Ole's compositions, failing to maintain accurate books and records, and failing to allow Ole a full and fair opportunity to conduct an audit.

38. By reason of the foregoing and other acts not presently known by Ole, EMI has knowingly and materially breached its contractual obligations to Ole under the Administration Agreements.

39. EMI's material breach of the Administration Agreements is the legal cause of substantial damage to Ole for which Ole seeks monetary damages in an amount to be determined at the time of trial, which upon information and belief is in excess of $800,000.

## Prayer for Relief

WHEREFORE, Ole prays for judgment against EMI as follows:

1. Compensatory damages in excess of $800,000, the exact amount of which to be determined at the time of trial;

2. An award of actual and reasonable attorneys' fees and costs for services rendered to Ole in this action;

3. An award of pre- and post-judgment interest;

4. A trial by jury on all triable issues; and,

5. All such other and further relief as the Court deems just and proper.

By:    _//S// Richard Busch_

Richard S. Busch (5613)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-541

By: _____

Kenneth E. Gordon (5703)
GORDON, GORDON & SCHNAPP, P.C.
437 Madison Avenue, 39th Floor
New York, New York 10022
Telephone: (212) 355-3200
Facsimile: (212) 355-3292